UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NANCY LABASH,
        Plaintiff,

vs.                                    CIVIL NO.: 04-CV-73345-DT

COMMISSIONER OF               HON. GERALD E. ROSEN
SOCIAL SECURITY,                MAG. JUDGE WALLACE CAPEL, JR.
        Defendant.
_____/

## REPORT AND RECOMMENDATION

**I.    RECOMMENDATION**

It is recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and enter judgment for Defendant.

**II.    REPORT**

This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits [DIB]. Plaintiff filed for benefits on January 10, 2001, alleging disability since April 15, 1999, due to a spinal cord tumor and inability "to stand, walk or sit for any length of time." (TR 39-41, 49). Benefits were initially denied on March 7, 2001. (TR 29-33). A de novo hearing was held on March 7, 2002, before Administrative Law Judge [ALJ] Alfred Varga. (TR 164-94). In a decision dated April 9, 2002, the ALJ found that Plaintiff could perform "sedentary work with a sit/stand option, very limited walking, bending and stooping, no work around heights, no driving, no work around hazardous machinery, only simple and routine tasks, and a low stress work environment." (TR 15-20). Accordingly, Plaintiff was found not disabled. The ALJ's

decision became the Commissioner's final decision when the Appeals Council denied review on July 20, 2004. (TR 6-8). The Plaintiff commenced this action for judicial review.[1]

A. **PLAINTIFF'S TESTIMONY**

Plaintiff testified that she lives in Utica, Michigan, with her husband and two sons, ages seven and two. (TR 167-68). She stated that she was born March 7, 1964, and was thirty-eight at the time of the hearing. (TR 168). She stated that she graduated from high school and then in 1990, she completed a two year diploma certification program in accounting. Id. However, she stated that she never worked in accounting. Id.

She testified that she last worked in August of 1994, just before her youngest son was born, and she is not currently working. (TR 168-69). She stated that she last worked at Paul's Kitchen as a waitress for two or three years. (TR 169). She stated that she also waitressed at one restaurant that kept changing names, all after completing high school. (TR 169-70). Plaintiff indicated that she has always worked as a waitress and her husband is employed as a milkman. (TR 170).

Plaintiff indicated that she became disabled April 15, 1999. (TR 171). She testified that she was at Walt Disney World with her friend and their children where she began collapsing when her legs would give out. Id. She stated that she was pregnant at the time and thought that it simply was the baby sitting on her sciatic nerve. Id. She stated that she never worried about it until she had her baby and was experiencing worsening symptoms. Id.

She indicated that she saw Dr. David Davis in November 1999, for her six week check up and he told her that her symptoms were abnormal and that she needed an MRI. (TR 171-72). She stated

---

[1] Plaintiff requested and received more time to file his civil action by the Appeals Council. (TR 6-7).

at the time she was falling all the way to the ground just trying to get out of her car "every couple days [sic]." (TR 172-73). She stated that she was even afraid to carry her baby. (TR 173).

Plaintiff stated that she was referred to Dr. Martha Frankowski, a neurologist, through her primary care physician, Dr. Getzinger. Id. She then ended up at William Beaumont Hospital where she had surgery on the middle part of her back February 4 or 5, 2000. Id. She then began one month of physical therapy at home until April 1, when she began five months of physical therapy at St. Joseph's Hospital, which ended August 2000. (TR 174). She stated that she "felt pretty good" physically and mentally after the therapy ended, but her left leg was not any better. Id. She explained that her foot would still drop and she would fall. Id.

She explained that following surgery her symptoms stayed the same and got worse. (TR 175). She stated that although the therapy made her "feel better . . the pain didn't go away." Id. She stated that she went back to her primary care physician and had a follow-up MRI. Id. She stated that she saw Dr. Zakalik who indicated that her damage "was permanent and that this would probably be the best it would get." Id.

She stated that she also saw Dr. Nershar, (phonetic), a physical medicine doctor, following surgery. (TR 176). However, she stated that he closed his practice and she started seeing Dr. Sharma for her leg and back. (TR 176-77). She indicated that she recently saw Dr. Sharma, a week prior to the hearing, who is having a new brace made for her leg and putting her back into physical therapy to work specifically on her stomach, hips, and lower back muscles. (TR 178, 187).

She stated that she currently has a brace that she has been wearing since surgery on her left leg that helps her with her "foot drop problem." (TR 179). She stated and demonstrated that the brace immobilizes her ankle so that her foot does not drop and so that she can maintain balance. Id. Plaintiff

also had a cane with her at the hearing that she indicated she uses when she does not know how far she will have to walk and also in the winter due to the snow and ice. Id.

She stated that her leg gets very stiff if she sits for too long and that she cannot walk farther than one block. (TR 177). She stated her back pain is still present. Id. She also indicated that she has difficulty balancing and can fall over if someone bumps into her in a crowd or a hallway. (TR 177-78). Plaintiff indicated that her right leg started to give out on her when her left leg first started to and she had another MRI. (TR 178). She then indicated that her right leg has been numb since surgery. Id.

Plaintiff indicated that she tries to do stretches and exercises that she learned while in physical therapy daily. (TR 180). She stated that she tries to ride a stationary bike a couple of times per week at home, but it hurts her back.[2] Id. She indicated that she used a TENS unit in combination with a heating pad in physical therapy, but that her back pain would return at night. (TR 180-81).

She testified that "everything" is difficult since her problems with the tumor in her back began. (TR 181). For example, she stated that getting out of bed in the morning is difficult and takes more time. Id. She also stated that if she cooks anything more difficult than macaroni and cheese, cooking is a problem because it requires her to stand on the kitchen floor, which hurts her back. Id. She stated that she has problems with taking care of her children including running after them, picking up after them, bending, changing diapers, and tying shoes. Id. She stated that she cannot stoop; rather, she has to sit on her knees on the floor to tie the children's shoes or change their diapers. (TR 181-82). She indicated that she believes her balance is what inhibits her from stooping and bending. (TR 181). She stated if she tried to stoop, she would "probably fall over." (TR 182). She stated that she has pain in her lower back and at the surgical site that is also associated with her inability to stoop. (TR 182-83).

---

[2]She stated that it is not a bike with an arm moving component. (TR 180).

She also stated that she has pain in her upper back when she tries to comb her hair and pain in her lower back when she tries to walk. (TR 183). She stated that she takes showers because getting in and out of the tub is difficult and her husband gives the children baths. Id. She stated that she has a cleaning lady who comes on Mondays to do the floors because she is unable to because of her back. Id. She stated that she vacuums if she has to, but the cleaning lady also vacuums on Mondays. (TR 183-84). She stated that she has a dust buster that she uses. (TR 184).

She stated that she is no longer engaged in any social activities. Id. She indicated that she used to play Bingo, but no longer is able to because of the sitting. Id. She stated that she still attends church every week for one hour on Monday nights, and the sitting causes her problems so she puts her coat behind her to support her back. (TR 184-85). She stated that her back pain progresses throughout the day. Id. She stated that she cannot go to the park with her children, but she can go to Chuck-E-Cheese and "sit and watch them . . . or get up and walk around, but [] not hav[e] to be active with them or get stuck up somewhere." Id.

Plaintiff testified that she could not do a job with a sit/stand option at will and not lift over two to four pounds because of her back and leg pain. (TR 185-86). She stated that she cannot concentrate on some days due to the pain. (TR 186). She stated that although her physical therapy notes indicate that she was doing better, she stated that she is the same and that they told her that "it's not going to get any better." Id. In fact, she stated that her left leg is worse since the surgery. (TR 187).

### B.   MEDICAL EVIDENCE

Examination of the parties' cross-motions for summary judgment reveals that an additional recitation of the Plaintiff's medical evidence would be repetitive. The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[3]

### C.   VOCATIONAL EXPERT'S TESTIMONY

Pauline Pegram, a vocational expert [VE], testified at the hearing. (TR 188-92). The VE categorized Plaintiff's past work as a waitress "at the medium exertional level," with the exception of Paul's Kitchen, which was light. (TR 188-89). The VE stated that the jobs were semi-skilled and the only transferable skills would be to similar waitress type jobs. Id.

The ALJ presented a hypothetical question to the VE in which a claimant with Plaintiff's age, education, work experience, the transferable skills noted, and assuming her testimony was accurate. Id. The ALJ asked whether such a claimant would be capable of Plaintiff's past work. Id. The VE stated that she would not be and further, that she was not capable of any other work. Id. The VE indicated that the vocationally limiting aspects of Plaintiff's testimony included:

> the pain and discomfort that she experiences in her lower and upper back and leg, that it makes it very difficult for her to concentrate and when asked directly whether or not she could perform a simple job of sitting and standing, where she could alternate, she felt that she would not be able to perform that job on a sustained basis. Certainly that would suggest she is, at least in her testimony, performing at less than a sedentary level of activity. The claimant does indicate that she does some tasks around the home, but she also has a housekeeper that comes once a week and the task that she engage in - - engages in. At home, she paces herself. It would depend upon the amount of time that she is sitting or resting in between tasks as to whether or not she would be able to sustain productivity on a, on a regular basis throughout the day. In terms of her ability to sit, stand, and walk, it would certainly suggest that at best, she would have to have a job with a sit/stand option, if you look at those in isolation. Certainly the balance issue that she indicates she has, Your Honor, would suggest that she should avoid jobs that were dependent upon significant standing and/or walking and she should avoid jobs

---

[3] See Subpart E., supra.

> that would put her at risk, such as open pits or moving machinery, where she would be a danger to herself or others.

(TR 189-90).

The ALJ then presented a hypothetical question to the VE in which a claimant with Plaintiff's age, education, and work experience and assuming the ALJ made

> a finding that at some point Ms. Labash regained the ability to perform at least - - or to perform sedentary levels of work, those are jobs that would not require a person to lift more than 10 pounds at any one time and generally lesser weights. In addition, the jobs would afford the option of sitting or standing off and on, that they would require very little walking, standing, stooping or bending in the performance of the assigned tasks, that they not be performed at any unprotected heights, requiring any driving or climbing or work around dangerous or hazardous machinery, that they be relatively simple and routine in nature, not requiring more than a step or two in the completion of the assigned task, as well as being low in stress.

(TR 190-91).

The VE stated that there were a subset of 22,000 unskilled and sedentary occupations with a sit/stand option. (TR 191). The VE stated that there were 10,000 industrial manufacturing positions and 12,000 service positions. Id.  Specifically, he identified the following service positions: information clerk and lobby attendant, 4,000 positions; telephone marketing clerk, 3,000 positions; and unskilled cashier and self-service gas station and restaurant, 5,000 positions. Id.  The VE stated that these jobs were all unskilled, entry-level, and in the Metropolitan Detroit area. (TR 192). The VE stated that the jobs would take "[n]o more than thirty days to orient to the new work place because they are unskilled and can be learned through short demonstration and a few verbal instructions." Id.  Plaintiff's counsel declined to question the VE. Id.

### D.    ALJ'S CONCLUSIONS

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found "that the claimant is status post decompression and excision of spinal tumor at T8 through T10 followed by six months of physical therapy, weakness of the left lower extremity and decreased

7

sensation in the right lower extremity," impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (TR 17, 18-19). The ALJ found Plaintiff not to be fully credible. (TR 19). Thus, he determined that Plaintiff had the residual functional capacity [RFC] to perform a significant number of jobs in the national economy. (TR 18, 19). Therefore, the ALJ concluded that although Plaintiff met "the disability requirements of the Social Security Act from April 15, 1999 through September 21, 2000," she is not currently eligible for disability. (TR 18, 19).

### E.     ANALYSIS

Plaintiff advances several claims in her Motion for Summary Judgment. Her Motion argues that the ALJ's decision is not supported by substantial record evidence because: (1) the ALJ erred in finding that Plaintiff did not meet Listing 11.08; and (2) the ALJ erred in finding that Plaintiff had the RFC to perform a limited range of sedentary work starting in September 2000.[4] In response, Defendant's Motion for Summary Judgment contends that the ALJ's decision is supported by substantial evidence.[5]

#### 1.     Standard of Review

This Court's review of the ALJ's conclusions is limited. The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g) (1997). Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). It is more than a scintilla of evidence, but less than a preponderance of evidence. Brainard v. Sec'y of Health and Human Servs., 889 F.2d 679, 681 (6th Cir. 1989).

---

[4]Plaintiff's Motion for Summary Judgment and Brief filed November 24, 2004 (hereinafter "Plaintiff's Brief"), at pages 6-11.

[5]Defendant's Motion for Summary Judgment and Brief filed February 18, 2005 (hereinafter "Defendant's Brief"), at pages 9-15.

This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed.  Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994).  Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence.  Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986).  Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); see also Thacker v. Comm'r of Soc. Sec., 99 Fed.Appx. 661, 665 (6th Cir. 2004) (unpublished).  Applying these standards, I will analyze each of Plaintiff's claims.

### a. Listing 11.08

Plaintiff alleges that she qualifies for disability benefits under Listing 11.08.[6]  Plaintiff must show that she suffers from a spinal cord or nerve lesion that causes "disorganization of motor function[7] as described in 11.04B." Under 11.04B, she must show "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station."  Section 11.04B refers to Section 11.00C, which states:

> *Persistent disorganization of motor function* in the form of paresis or paralysis, tremor, or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerbellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

---

[6]Plaintiff's Brief at pages 6-9.

[7]Motor dysfunction is an improper or disturbed function involving muscle activity, such as walking or (just as frequently) movements of body structures, as the movements involved in swallowing.  See 4 Attorneys' Dictionary of Medicine at M-273.

The Sixth Circuit has outlined how to apply the listings. Gambill v. Bowen, 823 F.2d 1009, 1012 (6th Cir. 1987). The Court points out that 20 C.F.R. § 404.1525 reads in pertinent part:

> (a) *Purpose of the Listing of Impairments.* The Listing of Impairments describes, for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity. Most of the listed impairments are permanent or expected to result in death, or a specific statement of duration is made. For all others, the evidence must show that the impairment has lasted or is expected to last for a continuous period of at least 12 months.
>
> * * *
>
> (c) *How to use the Listing of Impairments.* Each section of the Listing of Impairments has a general introduction containing definitions of key concepts used in that section. Certain specific medical findings, some of which are required in establishing a diagnosis or in confirming the existence of an impairment for the purpose of this Listing, are also given in the narrative introduction. If the medical findings needed to support a diagnosis are not given in the introduction or elsewhere in the listing, the diagnosis must still be established on the basis of medically acceptable clinical and laboratory diagnostic techniques. Following the introduction in each section, the required level of severity of impairment is shown under "Category of Impairments" by one or more sets of medical findings. The medical findings consist of symptoms, signs, and laboratory findings.
>
> (d) *Diagnosis of impairments.* We will not consider your impairment to be one listed in Appendix 1 solely because it has the diagnosis of a listed impairment. It must also have the findings shown in the Listing of that impairment.

Id.

First, Plaintiff argues that the ALJ's mention of "sustained disturbance of gross and dexterous movement" is in error because it refers to Plaintiff's arms and she has never asserted that her arms are in any way impaired.[8] Rather, Plaintiff points out that the ALJ should have focused on

---

[8]Plaintiff's Brief at pages 7-8. It is noted that her complaints are limited to her two lower extremities. However, even if one accepts her left leg complaints, she would still fail to show "sustained disturbance of . . . gait and station" of her right leg under Section 11.04B. (Cont'd . . .)
( . . . cont'd) Immediately after surgery, on February 23, 2000, the primary right leg complaint of numbness was discussed. (TR 116). Dr. Zakalik reported that "[p]reoperatively she had numbness in her right lower extremity which is virtually all better." Id. Further, in October 2000, Plaintiff reported that "[s]he still has some numbness of the right lower extremity in the calf and shin;

"sustained disturbance of . . . gait and station" under Section 11.04B.[9]  However, the ALJ went on to state that "[t]he claimant walks with a limp but does not require the use of a cane for ambulation. Her right lower extremity is strong and her weakness in the left lower extremity is 4/5." (TR 17). Therefore, it is clear that the ALJ was focusing on Plaintiff's leg and not her arms; therefore, the mention of "sustained disturbance of gross and dexterous movement" would simply be harmless error.

Further, Plaintiff argues that the ALJ failed to mention the potential diagnosis of Brown-Sequard's syndrome and use of an assistive brace.[10]  Although, Dr. Sharma indicated that there were symptoms suggestive of Brown-Sequard's syndrome, he never diagnosed same.  (TR 153-58). Further, even if he had, the mere diagnosis says nothing about the severity of an impairment. See 20 C.F.R. § 404.1525(d).  As in Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988), the court stated, "[t]he mere diagnosis of arthritis, of course, says nothing about the severity of the condition. Foster v. Bowen, 853 F.2d 483, 489 (6th Cir.1988) (diagnosable impairment not necessarily disabling)." Additionally, the record only contains treatment notes from two visits to Dr. Sharma and such a short length of treatment, is not due the level of deference that the ALJ gave to Plaintiff's treating neurologist, the opinion on which he primarily relied. (TR 18).  Lastly, Plaitniff's neurologist is a

---

however, she relates that this has improved somewhat." (TR 120). On a diagram completed at the same time, in which Plaintiff indicated the type of symptoms and location, she failed to indicated any numbness in the right lower extremity. (TR 122). Although, in September 2000 and April 2001, she had decreased sensation in the right lower extremity; in April 2001, her right leg was reported as "strong." (TR 115, 146).

[9]Plaintiff's Brief at page 7.

[10]Plaintiff's Brief at page 8.

specialist and under 20 C.F.R. § 404.1527(d)(5), the opinion of a specialist is entitled to greater weight than a non-specialist.

The ALJ's failure to mention Plaintiff's brace was also not in error. In the record, Plaintiff's ankle-foot orthosis [AFO], or footbrace was discussed, notably by her physical medicine doctors, Dr. Joseph R. Meerschaert and Dr. Sharma. (TR 123-26, 153-58). Dr. Meerschaert stated in March 2000, that Plaintiff was "walking much better with her brace and her cane." (TR 126). Then he reported in June 2000, that Plaintiff was not wearing her brace and that she told him that "she tries periods of walking without it, and she is able to walk approximately one-half hour before her left foot gives out." (TR 123). Dr. Meerschaert concluded that "as she gets stronger, her gait will definitely improve." (TR 124). In the fall of 2001, Dr. Sharma indicated that Plaintiff was walking with a limp and would "be fitted with a prefabricated AFO on a trial basis to see if this helps with her gait dysfunction." (TR 154). Although the ALJ did not discuss this evidence, it does not conflict with the evidence that he did discuss, which lead him to the conclusion that Plaintiff is capable of sedentary work with a sit/stand option. (TR 17-18). An ALJ need not comment on each and every piece of evidence. Anderson v. Bowen, 868 F.2d 921, 924 (7th Cir.1989).

Plaintiff also alleges that the "lesion (or defect) still remained after the tumor was removed."[11] Plaintiff relies on an MRI dated December 4, 2001.[12] (TR 159). However, this report clearly stated, "I do not see any enhancement following gadolinium to suggest recurrent neoplasm." Id. Further,

---

[11]Plaintiff's Brief at page 8.

[12]Plaintiff's Brief at page 8.

as Defendant points out, an MRI in April 2000, showed no evidence of a residual tumor and this was later noted by Dr. Zakalik in September 2000, and again in April 2001. (TR 115, 129, 146).[13]

### b. RFC for a Limited Range of Sedentary Work Beginning September 2001

Plaintiff argues that the ALJ improperly concluded that her disability ceased to exist in September 2001.[14] The ALJ stated, as Plaintiff outlines that "[a]s of September 21, 2000, the treating neurologist noted significant improvement in the claimant's condition following her physical therapy. The weakness in the left lower extremity was characterized as mild and she was able to ambulate without a cane (Exhibit 8F)."[15] (TR 18). Plaintiff argues that the ALJ misconstrued what was considered "mild" and failed to discuss Dr. Zakalik's notes of the severe spinal cord compression and "slow improvement."[16] The mild left knee weakness argument suggested by Plaintiff fails because Dr. Zakalik stated that her left knee weakness "symptom[] appear[s] to be better," (TR 115), which would suggest that the knee is improving and not evidence of a "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station" under §11.04B. As to the severe spinal cord compression, this was only when the tumor was present, and Dr. Zakalik clearly stated that "[t]here is no evidence for [sic] any residual tumor." (TR 115).

---

[13]Defendant's Brief at page 13, n. 4.

[14]Plaintiff's Brief at pages 9-11.

[15]Plaintiff's Brief at page 8.

[16]Plaintiff's Brief at page 10.

Plaintiff also argues that the ALJ failed to discuss her treatment with Dr. Getzinger and Dr. Sharma following the September 2000, report by treating neurologist Dr. Zakalik.[17] On the contrary, the ALJ did discuss these reports in some detail. (TR 16-17). Therefore, this allegation will not be discussed further.

Lastly, Plaintiff finds issue with the ALJ's discussion that Dr. Zakalik stated that any work Plaintiff performed should include a sit/stand option.[18] (TR 16, 17, 146). The ALJ stated, "[t]he treating neurologist concluded that the claimant could perform work activity provided there was a sit/stand option." (TR 16). The ALJ repeated on the following page of his decision, stating that "[i]n April 2001, the treating neurologist indicated that the claimant could perform work activity provided there was a sit/stand option." (TR 17). The doctor's letter actually, stated, as pointed out by Plaintiff,[19] "I advised her that in her work she should have a sit/stand option, so she does not sit or stand for too long in any position." (TR 146).

Plaintiff alleges first that this comment was in April 2001 and as such past the point of the ALJ's finding in September 2000 that she was no longer disabled.[20] This argument is unavailing. First, Plaintiff earlier accused the ALJ of failing to discuss evidence after the point at which he determined disability ceased, specifically, that of Dr. Getzinger and Sharma.[21] Second, an ALJ is required to make a comprehensive examination of the record; the comment by Dr. Zakalik was

---

[17]Plaintiff's Brief at pages 10-11.

[18]Plaintiff's Brief at pages 10-11.

[19]Plaintiff's Brief at page 10.

[20]Plaintiff's Brief at pages 10-11.

[21]Plaintiff's Brief at page 10.

14

included in the record and only furthered what the ALJ had already determined regarding Plaintiff's RFC. See Smith v. Chater, 99 F.3d 780, 781 (6th Cir.1996).

Additionally, Plaintiff argues, "[s]econdly the comment can hardly be interpreted as an unequivocal endorsement of Plaintiff's ability to return to full time unrestricted work."[22] This argument is undeveloped, and further, the comment was not the only evidence relied on by the ALJ in assessing Plaintiff's RFC. Nonetheless, it will not be discussed further because "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to....put flesh on its bones." McPherson v. Kelsey, 125 F.3d 989, 995-96 (6th Cir. 1997) (citations omitted).

> This may be one of those close cases where the evidence could go either way. However, [i]f the Secretary's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, see Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir.1983), and even if substantial evidence also supports the opposite conclusion, see Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir.1986) (en banc).

Cutlip v. Sec'y of Health and Human Servs., 25 F.3d 284, 286 (6th Cir.1994). Where, as here, the medical records contain substantial evidence to support an ALJ's finding of an improving condition, there is no error. See Garner v. Heckler, 745 F.2d 383, 389 (6th Cir. 1984).

### III. CONCLUSION

For the reasons stated, I find that the ALJ's decision denying Plaintiff benefits is substantially supported in the record. Accordingly, I respectfully recommend that the Court **DENY** Plaintiff's

---

[22]Plaintiff's Brief at page 11.

Motion for Summary Judgment, **GRANT** Defendant's Motion for Summary Judgment, and enter judgment for Defendant Commissioner.

Pursuant to Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objection within ten days after being served with a copy thereof. The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals. United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

In accordance with the provisions of Fed.R.Civ.P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.

                                              s/Wallace Capel, Jr.
                                              **WALLACE CAPEL, JR.**
                                              **UNITED STATES MAGISTRATE JUDGE**

**Dated:**   July 27, 2005

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2005, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Janet L. Parker, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: William M. White, and Social Security Administration.

    s/James P. Peltier
    United States District Court
    Flint, Michigan 48502
    810-341-7850
    E-mail:   pete_peltier@mied.uscourts.gov